25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA, )
)
v. )
)
STEVEN KELLAM, )
)
Defendant. )

UNSEALED 1/15/08 KJK

SEALED

Criminal Action No. 07-22-JJF

**GOVERNMENT RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS**

**NOW COMES** the United States of America, by and through its undersigned attorneys, and hereby responds to Defendant's Motion to Suppress Physical Evidence and Statements, and respectfully requests that this Court deny the defendant's Motion.

**INTRODUCTION**

On February 15, 2007, the federal grand jury for the District of Delaware returned a one count Indictment charging the defendant, Steven Kellam with possession of cocaine with intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). On April 27, 2007, the defendant filed a Motion to Suppress Physical Evidence and Statements, and an evidentiary hearing on this Motion was held before this Court on July 11, 2007.

**PROPOSED FINDINGS OF FACT**

On February 5, 2007, agents from the Drug Enforcement Administration (DEA) and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) received information from a confidential informant (CI) that the defendant planned a car trip to Atlanta to purchase cocaine after the defendant and the CI visited their respective Delaware state probation officers that morning. Suppression Hearing Transcript ["Supp. Tr."], at 16. Agents observed the CI and the defendant

arrive at the probation offices in a black Mitsubishi. Supp. Tr. 17. The CI was driving the vehicle and the defendant was the passenger. Supp. Tr. 17. Law enforcement agents met with the CI inside and instructed him to keep in contact with law enforcement during the course of the day. Supp. Tr. 18.

Surveillance was established by DEA and ATF agents who observed the Mitsubishi stopping at various locations in Delaware during which time two other individuals were separately picked up Supp. Tr. 20-26. At this point, the informant was still believed to be the driver of the vehicle. Supp. Tr. 28. At some point later in the day, agents were contacted by the CI who informed them that the trip to Atlanta was cancelled. Supp. Tr. 26-27. The CI explained that the defendant's probation officer scheduled a meeting the next day and there was not time to get to Atlanta and. Supp. Tr. 27. Officers nevertheless maintained surveillance of the vehicle, which drove to New York City and then back to Delaware later that evening. During the trip, the CI attempted to call officers, however, there was no further direct contact between the CI and law enforcement during the remainder of the trip. Supp. Tr. 31, 41.

Agents knew that both the CI and the defendant were on Delaware state probation. Supp. Tr. 36. That evening, ATF Special Agent Scott Curley contacted a member of the state probation officer who confirmed that each was on Level III probation, meaning that neither was permitted to leave the state of Delaware nor to remain out after 10:00 pm without permission. Supp. Tr. 36. The state probation officer told Special Agent Curley that neither the CI nor the defendant had received permission to leave the state or to be out past curfew, Supp. Tr. 36, and instructed him to have a peace officer detain the CI and the defendant for probation violations upon their re-entry into the state of Delaware. Supp. Tr. 37.

Moreover, a computer database check made earlier that day also had revealed that the CI was wanted on two recent warrants. Supp. Tr. 34. In addition, agents ran the CI and the defendant's driving history that night, confirming that neither had a valid driver's license. Supp. Tr. 34-35.

Just before midnight, the black Mitsubishi was followed across the Delaware state line via the Delaware Memorial Bridge. Supp. Tr. 37-38. Officers from the Delaware River Bay Authority (DRBA), in conjunction with DEA and ATF agents, stopped the vehicle just after it crossed into Delaware. Supp. Tr. 37-38.

Each occupant of the car was ordered to exit the car one by one via loud speaker. The CI, who was the driver of the vehicle, exited the car first and was brought behind a DRBA police cruiser where he made contact with DEA and ATF agents. Supp. Tr. 40. The CI immediately informed agents that there were drugs hidden above the dome light in the passenger compartment of the car. Supp. Tr. 40. This interaction occurred only three or four minutes after the initial stop occurred. Supp. Tr. 41.

The CI was then placed under arrest for his outstanding warrants and for violation of his probation, and was issued a ticket by DRBA for driving with a suspended license and for operating a vehicle with overly dark window tinting. Supp. Tr. 45.

The defendant was meanwhile brought to the rear of a different police cruiser, handcuffed, and patted down for weapons. Supp. Tr. 42, 46. Because it was extremely cold that evening, and to permit traffic to resume its normal flow across the bridge, the occupants of the vehicle, including the defendant, were taken in police cruisers to the DRBA station, a few hundred yards away. Supp. Tr. 47, 49-50. The black Mitsubishi was not registered to or owned by any of the vehicle's occupants, but rather was in the name of Letoya Jackson. Supp. Tr. 47-48; Gov't Ex. 1. Because

the registered owner of the vehicle was not present, the vehicle could not thereafter be released. Supp. Tr. 51-52.

The Mitsubishi was thus driven into the nearby DRBA garage, where a trained K-9 unit was already on hand. Supp. Tr. 8, 49. Once inside the car, the canine immediately alerted to the area near the dome light. Supp. Tr. 10-11. The dome light cover was then removed by agents, where they discovered a package weighing approximately a quarter kilogram of what was believed to be cocaine. Supp. Tr. 49-50. Approximately 20 to 25 minutes elapsed from the time that the initial traffic stop was made until the time that the package was discovered. Supp. Tr. 51.

After the package was found in the dome light, the defendant was placed under arrest and was advised of his *Miranda* rights. Supp. Tr. 52. The defendant confirmed that he understood his rights, and agreed to speak with DEA agents. The defendant stated that he went to New York to pick up his mink coat and watch, and that Terrence Johnson, another occupant of the car, wanted to go shopping and had purchased a pair of blue jeans in Manhattan. Supp. Tr. 53. The defendant also offered to make a controlled purchase of drugs if agents could promise not to press charges, and specified that he could buy drugs from sources in Atlanta, Georgia, and New York. The defendant, however, denied possession or knowledge of the drugs discovered in the car that evening. Supp. Tr. 53-54.

**PROPOSED CONCLUSIONS OF LAW**

The defendant contends that the police lacked probable cause to stop the Mitsubishi. The defendant also asks this Court to suppress statements made by the defendant following his arrest. For the reasons that follow, these arguments are without merit, and this Court should deny the defendant's Motion.

**I. There was Reasonable Suspicion to Make the Initial Stop of the Vehicle.**

Law enforcement officers need only reasonable suspicion of a traffic offense or other criminal activity to justify an investigatory stop of a vehicle. *See United States v. Delfin-Colina*, 464 F.3d 392, 397-98 (3d Cir. 2006); *see also United States v. Cortez*, 449 U.S. 411, 417 (1981) (applying reasonable suspicion standard to brief investigatory stop of a vehicle). An investigatory vehicle stop should be reviewed objectively, "[t]hat is, a court should only look to whether specific, articulable facts produced by the officer would support reasonable suspicion." *Delfina-Colina*, 464 F.3d at 398 (citing *Whren v. United States*, 517 U.S. 806 (1996)).

As *Whren* makes clear, the officer's motivation for the stop is not relevant, even if it differs from the reasonable suspicion which justifies the stop. In *Whren*, two police officers observed a truck in a "high drug area" that had stopped at a stop sign for an excessive amount of time, and then turned without signaling and sped off. 517 U.S. at 808. The officers gave chase and stopped the vehicle, and during the stop observed the passenger holding two bags of what appeared to be crack cocaine in plain view. The Supreme Court concluded that the stop was reasonable even if it was purely pretextual, finding the "actual motivations of individual officers" to be irrelevant because "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.* at 813; *see also Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("[The] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."); *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir. 2003) ("Improper motive, however, is irrelevant to the question whether the objective facts available to the officers at the time reasonably could have led the officers to conclude that Smith was committing an offense." (citing *Whren*, 517 U.S. at 813)). In this case, the officers were justified in stopping the vehicle based on the

defendant's own violation of probation, and based on the CI's violation of probation, his outstanding arrest warrants, and driving with a suspended license.

### *A. The Officers Had Reasonable Suspicion to Stop and Detain the Defendant for Violation of Probation.*

First, the officers had reasonable suspicion that the defendant was an occupant of the car and that he was on Level III probation in the State of Delaware. As Level III probationer, he was not permitted to leave the state of Delaware, nor be out past 10:00 p.m., without permission from the probation office. The first probation violation occurred when the Mitsubishi left the state of Delaware, and the second violation occurred when the defendant remained out after 10:00 p.m. The vehicle was stopped, just before midnight, immediately upon its re-entry into Delaware.

Shortly before making the stop, a member of the investigative team, Special Agent Curley, confirmed that the defendant did not receive permission to leave Delaware, and Special Agent Curley received oral authorization to detain the defendant (as well as the CI) from a member of the Delaware Probation office. *See* 11 Del. C. § 1904 ("[A]n arrest by a peace officer without a warrant for violation of probation is lawful whenever the peace officer has a reasonable ground to believe that the person to be arrested has committed a new offense within or without the State during a period of probation and has thereby violated a condition of said probation imposed upon the person by a court of this State."). The stop of the vehicle was made by DRBA officers, in conjunction with agents from DEA and ATF. DRBA officers are considered peace officers authorized to make arrests for violations of probation under Delaware law. *See* 11 Del. C. § 1901 ("'Peace officer' is any public officer authorized by law to make arrests in a criminal case."); Supp. Tr. 38. Given that the vehicle was seen exiting and leaving the state with the CI and the defendant inside, and with the specific

authorization given by probation officers to detain both the defendant and the CI for violation of probation, the DRBA officers clearly had reasonable suspicion to stop the vehicle on that basis.

### B. *The Officers Had Reasonable Suspicion to Stop the Vehicle Based on the CI's Violation of Probation, his Outstanding Arrest Warrants, or For Driving With A Suspended License.*

The officers could justify the stop based on the active, outstanding warrants for the CI's arrest at the time of the vehicle was pulled over. *See United States v. Hensley*, 469 U.S. 221, 229 (1985) (holding that *Terry* stop permitted based on reasonable suspicion that individual is wanted on outstanding warrant); *see also United States v. Fields*, 176 Fed. Appx. 327, 330 (3d Cir. 2006) (Not Precedential Opinion) (finding reasonable suspicion to stop vehicle where occupant had active bench warrant). The CI, moreover, like the defendant, was also confirmed to have been in violation of his probation by leaving the state and being out past the 10:00 p.m. curfew.

In addition, the officers knew that neither the CI nor the defendant had a valid driver's license. Surveillance officers had previously observed the CI driving the car to the probation office, and saw the CI driving during the stops in Delaware, *see* Supp. Tr. 17, 28, and had reasonable suspicion that he or the defendant was driving at the time of the traffic stop.

Under *Whren*'s objective approach, the police were entitled to rely on the CI's probation violation, his outstanding warrants, or his commission of traffic infractions as valid bases for the stop. The defendant subjected himself to being stopped by police when he voluntarily drove with an individual who had outstanding arrest warrants, lacked a valid license, and was in violation of his own probation. The Supreme Court has further recognized that a defendant assumes the risk that the people with whom he associates may in fact be cooperating with the government. *See United States v. White*, 401 U.S. 745, 749 (1971) ("[H]owever strongly a defendant may trust an apparent

colleague, his expectations in this respect are not protected by the Fourth Amendment when it turns out that the colleague is a government agent regularly communicating with the authorities.")[1]

### *C. The Timing of the Stop Was Permissible.*

As a corollary to *Whren*'s purely objective approach, the Supreme Court does not require law enforcement to conduct a stop or arrest at the moment that reasonable suspicion (or probable cause) is developed. Rather, the Supreme Court has held that officers may delay an arrest in order to develop further investigative leads, provided that there was reasonable suspicion for the stop at the time it was actually made. *See Hoffa v. United States*, 385 U.S. 293, 310 (1966) ("Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.").

Thus there was no requirement that the officers stop the vehicle immediately upon the violation of probation. *See id.* at 310; *see also United States v. Ayers*, 2003 WL 292086 (D.Del. 2003) ("The fact that two weeks elapsed from the initial finding that defendant may have violated the above cited Delaware laws until the day he was stopped on the off-ramp does not, alone, cause the court to pause on review of this stop." (citing *Whren*, 507 U.S. at 813)).[2] Similarly, while law

---

[1] At any rate, the record reflects that during the round trip to New York, and at the time of the stop, the CI was not acting as a government agent. Earlier in the day, the CI had been instructed only to stay in contact with law enforcement, but was not told to cross state lines or to stay out past curfew. Indeed, there was no direct contact between the CI and law enforcement after the CI called to inform agents that the trip to Atlanta was cancelled. Supp. Tr. 41. It was not until the vehicle was actually stopped that law enforcement learned the purpose of the trip to New York, and were able to find out from the CI why he failed to contact police during the course of the afternoon and evening.

[2] The stop could not, in fact, have been made until the vehicle re-entered the state of Delaware, because that was the first time after the probation violations occurred that Delaware peace

enforcement officers were aware of the CI's arrest warrants and suspended license earlier in the day, they were not required to arrest or stop him immediately. *See Hoffa,* 385 U.S. at 310; *see also United States v. Johnigan*, 90 F.3d 1332, 1337 (8th Cir. 1996) (finding that officers were under no obligation "upon learning of Johnigan's outstanding arrest warrants, to arrest him immediately while he was still at the hotel, rather than at the airport"); *United States v. De Biasi*, 712 F.2d 785, 795 (2d Cir. 1983) ("So long as probable cause as to his participation existed at time of the arrest, there can be no objection to its timing"); *United States v. Pryba*, 502 F.2d 391, 400 n.59 (D.C. Cir. 1974) ("Nor are law enforcement officers obliged to intercept incipient criminality before the participation of others therein can be ascertained.").

**II. The Stop Was Conducted in a Reasonable Manner.**

Once the vehicle was legitimately stopped, the officers were permitted to order the occupants to get out of the vehicle without any further particularized suspicion. *See Maryland v. Wilson*, 519 U.S. 408, 415 (1997); *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977)).

Moreover, the manner in which the stop was conducted and the occupants ordered out of the car was reasonable given the observations and information suggesting that the occupants of the car had gone to New York to purchase drugs, the fact that there were four individuals in the car, at least two of whom were in violation of probation. *See Maryland v. Wilson,* 519 U.S. 408, 414 (1997) (noting that "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car"); *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) (holding that it was a reasonable *Terry* procedure to block the defendant's car with their

---

officers would have had jurisdiction to make an arrest for either probation violation.

cruisers and approaching with guns drawn in responding to an anonymous tip concerning drug activity). *Cf. Baker v. Monroe Township*, 50 F.3d 1186, 1193 (3d Cir. 1995) ("There is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest.").

Even though the stop had not necessarily ripened into a custodial arrest at this point, given that the defendant had been in clear violation of his probation for leaving the state without permission, the DRBA officers had probable cause to place him under arrest at that time. At any rate, after the CI informed officers that there were drugs in the dome light of the car — only three to four minutes following the initial stop of the car — the officers had a reasonable basis to move the vehicle to the nearby station garage, and to detain the occupants of the car for the additional 10 to 15 minutes required to search the car. *See United States v. McGlory*, 968 F.2d 309, 343 (3d Cir. 1992); *see also United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005) ("[I]nformation lawfully obtained during that period may provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation.").

Moving the car and its occupants from the side of the bridge was further justified because neither the CI nor the defendant had a valid license, nor was the registered owner of the vehicle present, and thus the vehicle could not be released. In addition, it was necessary to move the car in order to clear the bridge and to permit normal traffic to resume and to get the occupants and the officers out of the cold weather. *See Florida v. Royer,* 460 U.S. 491, 504-05 (1983) ("[T]here are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention"); *see also United States v. Gori*, 230 F.3d 44, 56 (2d Cir. 2000) ("[I]t is well established that officers may ask (or force) a suspect to move as part of a lawful *Terry* stop."); *Halvorsen v. Baird,* 146 F.3d 680, 684-85 (9th Cir. 1998) (permitting officers

to handcuff suspect and drive him to a nearby gas station for questioning as part of a *Terry* investigation); *United States v. Kapperman*, 764 F.2d 786, 792 (11th Cir. 1985) ("To conduct the search at the site of the initial stop would have unduly impeded the traffic moving along the busy street. Thus police acted reasonably in moving to a nearby area.").

**III. The Defendant Lacks Standing to Challenge the Search of the Vehicle.**

Because he was a mere passenger in the vehicle, which was registered to and owned by a third party, the defendant's has standing only to seek suppression of the fruits of an illegal ***seizure*** if the initial traffic stop was invalid. *See Brendlin v. California*, 127 S.Ct. 2400 (2007).

But where, as here, the initial stop was supported by reasonable suspicion, "a passenger in a car that he neither owns nor leases typically has ***no standing to challenge the search of the car.***"[3] *United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006) (emphasis added) (citing *Rakas v. Illinois*, 439 U.S. 128 (1978)). In *Rakas*, the Supreme Court held that vehicle passengers, who neither owned or leased the vehicle, lacked standing to challenge a search of the vehicle's glove compartment, even though the passengers were in the car with the permission of the owner. 439 U.S. at 148. The Third Circuit has thus observed that "Fourth Amendment rights are personal rights, and a search of a car does not implicate the rights of non-owner passengers: the car is treated conceptually like a large piece of clothing worn by the driver." *Mosley*, 454 F.3d at 253.

In this case, the vehicle was registered to a third party and was neither owned nor leased by the defendant, who was merely a passenger in the car. As a result, under *Rakas*, the defendant lacks

---

[3]In *Brendlin,* the Supreme Court took care to note that the defendant "claimed only that the traffic stop was an unlawful seizure of his person," and "did not assert that his Fourth Amendment rights were violated by the search" of the vehicle. 127 S.Ct. at 2404 (citing *Rakas*, 439 U.S. 128).

standing to challenge the search of the passenger compartment which occurred after a legitimate investigatory stop.

## IV. At Any Rate, the Search of the Passenger Compartment Was Valid as a Search Incident to Arrest and Because the Search was Supported By Probable Cause.

Once the car was stopped and the occupants exited the vehicle, the CI was immediately placed under arrest on his outstanding warrants. Following a lawful custodial arrest of an occupant of an automobile, police may search the passenger compartment of that automobile incident to arrest. *New York v. Belton*, 453 U.S. 454, 460 (1981). Any containers found within the passenger compartment may also be searched by police, including the hidden compartment above the dome light. *See id.* at 461 n.4 (noting that "containers" include "closed or open glove compartments, consoles, or other receptacles located anywhere within the passenger compartment, as well as luggage, boxes, bags, clothing, and the like"). The police may conduct a search incident to arrest even if the occupants had already been placed into custody. *See Thornton v. United States*, 541 U.S. 615, 624 (2004) (upholding search incident to arrest where petitioner had already been arrested, handcuffed, and placed in the back of the patrol car prior to the search).

Furthermore, the police independently had developed probable cause to search as soon as the CI made contact with police and informed them that there was cocaine secreted in the dome light of the vehicle. It was at that point that the vehicle was driven to the nearby DRBA station and subjected to a canine scan. The canine alerted to the area near the dome light. When agents took off the dome light cover, they discovered approximately a quarter kilogram of cocaine. The CI's report, combined with the circumstances of the trip, and the canine alert were sufficient to establish probable cause to search the dome light area. *See United States v. Massac*, 867 F.2d 174, 176 (3d Cir. 1989) ("When the alert was given by the dog, we are satisfied that, at least when combined with

the other known circumstances [an anonymous tip and suspicious purchases of railroad tickets], probable cause existed to arrest.").

## V. The Defendant Knowingly and Voluntarily Waived His Miranda Rights.

The Government acknowledges that, at the time he made the challenged statements, the defendant was in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436 (1966). The defendant, however, was promptly informed of his *Miranda* rights, and informed the officers that he understood them. Supp. Tr. 52-53. The defendant then voluntarily agreed to make a statement to the agents. His statement is therefore admissible.

**WHEREFORE,** the United States requests that the Court deny the defendant's Motion to Suppress Physical Evidence and Statements.

Respectfully submitted,

COLM F. CONNOLLY
UNITED STATES ATTORNEY

BY: /s/ Ilana H. Eisenstein
Ilana H. Eisenstein
Assistant United States Attorney

Dated: August 20, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA, :
:
Plaintiff, :
:
v. : Criminal Action No. 07-22-JJF
:
STEVEN KELLAM, :
:
Defendant. :

**CERTIFICATE OF SERVICE**

I, Jennifer Brown, an employee in the Office of the United States Attorney, hereby certify under penalty of perjury that on August 20, 2007, served the foregoing:

**GOVERNMENT'S RESPONSE TO DEFNEDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS**

by causing two (2) copies of said document to be delivered via ECF to counsel of record at the following address:

Edson A. Bostic, Esquire
Federal Public Defender
First Federal Plaza
704 King Street, Suite 110
Wilmington, DE 19801

/s/Jennifer Brown
Jennifer Brown