

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | UNDER SEAL UNSEALED |
| | : | 1/15/08 KSK |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 07-22-JJF |
| | : | |
| STEVEN KELLAM, | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
AMENDED MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS**

Defendant, Steven Kellam, by and through his undersigned counsel, Edson A. Bostic, Federal Public Defender for the District of Delaware, respectfully submits this Memorandum of Law in support of his Amended Motion to Suppress Physical Evidence and Statements. For the reasons set forth below, Mr. Kellam seeks to exclude the Government's admission, at trial, of any and all physical evidence illegally seized by law enforcement officials on or about February 6, 2007, including any and all statements made during, or subsequent to, the illegal search.

**I. INTRODUCTION**

On February 15, 2007, Mr. Kellam was indicted for knowingly possessing cocaine with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). On April 27, 2007, Mr. Kellam filed an Amended Motion to Suppress Physical Evidence and Statements. On July 11, 2007, the Court conducted an evidentiary hearing to determine Mr. Kellam's Amended Motion. During the hearing, the parties agreed that the suppression issue would be limited to the legality of the initial traffic stop, which led to the discovery of drugs and Mr. Kellam's arrest. (Tr. 86-92).

## II. FACTUAL BACKGROUND

### A. Investigative Report Summary[1]

On February 5, 2007, federal investigators received information from Dwayne Coverdale,[2] a case informant, that Mr. Kellam was preparing to make a trip to purchase cocaine. Based on this information, the investigators initiated surveillance of Mr. Kellam at the Delaware State Probation and Parole Office in Dover, Delaware.

Surveillance units followed Mr. Kellam, who was traveling with Mr. Coverdale in a black Mitsubishi, from Dover to Bridgeville, Delaware. Mr. Kellam and Mr. Coverdale traveled to the Georgetown Apartments in Georgetown, Delaware, where he picked up Antawn Crawford and later returned to his home.

Surveillance units followed Mr. Kellam, Mr. Crawford and Mr. Coverdale to the Dover Mall, where they picked up Terrence Johnson, and traveled along Delaware Route 1, US-13, the Delaware Memorial Bridge, the New Jersey Turnpike and the George Washington Bridge. According to the investigators, the vehicle frequently traveled at high rates of speed and rarely used turn signals.

Surveillance units observed the vehicle enter the Bronx and park near 178th Street for approximately two hours. According to the investigators, this area was identified by Mr. Coverdale as the location where Mr. Kellam would allegedly purchase cocaine. The discovery did not report any observations which indicated that a drug purchase occurred at this location.

---

[1] Mr. Kellam recounts the facts from the Investigative Report Summary and Affidavit of Probable Cause because of the extreme inconsistencies between these reports and agent testimony during the evidentiary hearing.

[2] The discovery did not provide Mr. Coverdale's name. His identity, however, was provided, without objection, during the evidentiary hearing. (Tr. 58).

Surveillance units followed the vehicle back to the New Jersey Turnpike and observed three occupants exit the vehicle and enter the food court. Shortly thereafter, the vehicle continued on the New Jersey Turnpike and traveled at or slightly above the speed limit, and almost always used its turn signal when changing lanes. The car also made a second stop at a rest area before crossing the Delaware Memorial Bridge.

At some point in time, the investigators checked the DELJIS system and discovered that Mr. Kellam and Mr. Coverdale, the vehicle's driver, were level three probationers, and that a warrant was available for Mr. Coverdale. Approximately ten hours later, and upon re-entering Delaware, the Delaware River and Bay Authority stopped the Mitsubishi and arrested the occupants. Law enforcement officers searched the vehicle after the arrests, and seized approximately 300 grams of a white, powdery substance in the vehicle's overhead light compartment. The substance field tested positive for the presence of cocaine.

### B. Evidentiary Hearing Testimony

The Court conducted the evidentiary hearing on July 11, 2007. At the hearing, the Government presented: (1) Officer Joseph Krajewski; and (2) Special Agent Thomas Jacobs. Mr. Kellam recounts Special Agent Jacobs' testimony because it is directly relevant to the initial traffic stop.[3]

#### 1. Special Agent Thomas Jacobs' Testimony

Special Agent Jacobs, a criminal investigator for the DEA, testified that he was the lead agent during the DEA's investigation of Mr. Kellam, which began in October 2006. (Tr. 15). Special

---

[3] Officer Krajewski's testimony focused on the K-9 search of the vehicle after the traffic stop and arrests, which resulted in the discovery of controlled substances in the vehicle's dome light. (Tr. 6-11).

3

Agent Jacobs testified that on February 5, 2007, Task Force Officer Mark Gray received information from Mr. Coverdale, a confidential informant, that he and Mr. Kellam were meeting Probation & Parole officers in Dover, and would depart to Atlanta, Georgia for a drug-related trip. (Tr. 16).

Special Agent Jacobs testified that the agents established surveillance and observed Mr. Kellam and Mr. Coverdale arrive at probation in a black Mitsubishi Galant, which was driven by Mr. Coverdale. (Tr. 17). Special Agent Jacobs testified that the vehicle, which he had previously seen before, had distinctive chrome rims, a personalized Delaware license tag, and "very dark tinted windows . . . to the point where you would not be able to either recognize or maybe even observe if someone was actually sitting in the car, depending on if it was day or night." (Tr. 19, 20).

Special Agent Jacobs testified that Officer Gray and Task Force Officer Marvin Mailey met with Mr. Coverdale inside of the probation offices, and that Mr. Coverdale stated that he and Mr. Kellam were going to switch cars and drive to Atlanta. (Tr. 17). Special Agent Jacobs testified that the agents were not able to establish a wiring or monitoring system, and instructed Mr. Coverdale to keep in contact with agents "as best he could," and to pull into a prearranged location if he observed a large amount of cash in the vehicle. (Tr. 17-18).

Special Agent Jacobs testified that after this meeting, Mr. Kellam and Mr. Coverdale were followed by several law enforcement officials as they drove toward the southern part of the state. (Tr. 20). Special Agent Jacobs testified that the vehicle arrived at Lamont Johnson's residence, whom he believed to be a "lieutenant or a subdistributor of cocaine of Mr. Kellam," and stayed there for thirty minutes. (Tr. 22).

Special Agent Jacobs testified that during this time, Mr. Coverdale met with law enforcement officials and told them that he and Mr. Kellam would not be switching cars, as planned. (Tr. 23).

4

Special Agent Jacobs testified that the officers told Mr. Coverdale to pull into the local Hardee's if he observed a large amount of cash in the vehicle after he and Mr. Kellam left the area. (Tr. 23). Special Agent Jacobs also testified that the vehicle subsequently traveled to Georgetown Apartments, and officers observed Antoine Crawford get into the vehicle. (Tr. 24). Special Agent Jacobs testified that the vehicle traveled to the home of Mr. Kellam's girlfriend, and Mr. Kellam entered the home for a few minutes, came out with a package and got back into the vehicle. (Tr. 24-25).

Special Agent Jacobs testified that the vehicle traveled to the Mount Joy trailer community and to a store in Milton, Delaware. (Tr. 25-26). Special Agent Jacobs testified that at this point, Mr. Coverdale contacted the officers and told them that the Atlanta trip was canceled because Mr. Kellam's probation officer wanted to meet with him the following day. (Tr. 26-27). Special Agent Jacobs testified that Mr. Coverdale stated that he was going to be dropped off at his residence. (Tr. 27).

Special Agent Jacobs testified that the officers observed the vehicle pick up Terrence Johnson at the Dover Mall, and travel northbound on Route 1. (Tr. 27). Special Agent Jacobs also testified that the vehicle was followed across the Delaware Memorial Bridge, to a rest stop on the New Jersey Turnpike and into New York City. (Tr. 27). Special Agent Jacobs testified that an air wing also followed the vehicle to New York until it became dark, and that agents believed that Mr. Coverdale drove the vehicle. (Tr. 28, 31). Special Agent Jacobs concluded that:

> [I]f they were not going to Atlanta, they were going to New York, which is a main source city for this area, to pick up a controlled substance . . . [b]ecause it fit the pattern that we've observed in other investigations where they go around for these little short-lived meetings with individuals that we know are involved in drugs also, to either collect the order and/or the cash to do the purchase in the source city, which is New York in this case.

(Tr. 30).

Special Agent Jacobs testified that the agents "later learned" that Mr. Coverdale had attempted to contact Officer Gray when the vehicle stopped in New Jersey, but Officer Gray did not receive the call because of poor reception. (Tr. 31). Special Agent Jacobs testified that the agents' last contact with Mr. Coverdale occurred when the vehicle was at the store in Milton, and the agents had no further contact with Mr. Coverdale prior to stopping the vehicle. (Tr. 31-32).

Special Agent Jacobs testified that the agents lost contact with the vehicle because of the New York traffic, and he contacted agents in New York. (Tr. 32). Special Agent Jacobs testified that the New York agents located the vehicle on Cabrini Boulevard in Manhattan, and observed three individuals in the car. (Tr. 33). Special Agent Jacobs testified that the New York agents subsequently followed the vehicle back to New Jersey, and he was informed that three subjects were in the vehicle, which pulled into a rest stop in New Jersey. (Tr. 33).

Special Agent Jacobs testified that the vehicle left the rest area, traveled south on the New Jersey Turnpike and pulled off at an exit. (Tr. 33). Special Agent Jacobs testified that agents lost sight of the vehicle at that time, but subsequently observed it crossing the Delaware Memorial Bridge. (Tr. 34).

Special Agent Jacobs testified that the agents learned that Mr. Coverdale had an outstanding capias for his arrest, and that he knew Mr. Coverdale had an invalid driver's license. (Tr. 34). Special Agent Jacobs testified that Special Agent Scott Curley, who was stationed at the Delaware River & Bay Authority at the Delaware Memorial Bridge, ran Mr. Kellam's driver's license and learned that he did not have a valid license. (Tr. 34-35). Special Agent Jacobs also testified that the agents could not see into the vehicle because of its speed and tinted windows. (Tr. 35-36).

Special Agent Jacobs testified that the agents knew that Mr. Kellam and Mr. Coverdale were on probation. (Tr. 36). Special Agent Jacobs testified that Agent Curley contacted Delaware State Probation on the evening of February 5th, and learned that they were not supposed to leave the State without permission or to be out after midnight. (Tr. 36). Special Agent Jacobs testified that a probation officer instructed Agent Curley to detain Mr. Kellam and Mr. Coverdale, and that probation would arrest them for violations. (Tr. 37).

Special Agent Jacobs testified that the Delaware River Bay Authority conducted the traffic stop. (Tr. 38-39). Special Agent Jacobs testified that Mr. Coverdale, who was the driver of the vehicle, was ordered out of the vehicle, checked for weapons and handcuffed. (Tr. 39). Special Agent Jacobs testified that he talked to Mr. Coverdale, who told him that narcotics were located in the vehicle's dome light, and that he previously tried to make contact with Officer Gray. (Tr. 40-41).

Special Agent Jacobs testified that the other occupants of the vehicle were ordered out of the car, and that Mr. Kellam was the front seat passenger. (Tr. 41-42). Special Agent Jacobs testified regarding the safety precautions utilized during Mr. Kellam's arrest because of his prior involvement in firearms offenses, and because the agents believed that he had been on a drug-related trip and may have had a firearm. (Tr. 43-44).

Special Agent Jacobs testified that Mr. Coverdale was arrested for a probation violation, and issued a ticket for driving with a suspended license and having tinted windows, in violation of state law. (Tr. 45-46). Special Agent Jacobs testified that Special Agent Curley drove the vehicle to a maintenance bay adjacent to the location of the traffic stop, and Officer Krajewski's K-9 search revealed the location of cocaine in the dome light. (Tr. 48-51).

Special Agent Jacobs testified that he subsequently met Mr. Kellam at the police station,

advised him of his <u>Miranda</u> rights and took his statement. (Tr. 52-53). Specifically, Special Agent Jacobs testified that Mr. Kellam denied any knowledge of the drugs in the vehicle, and stated that the four men went to New York for a shopping trip and to pick up his watch and a fur coat. (Tr. 53). Special Agent Jacobs testified that Mr. Kellam stated that he would purchase cocaine for the Government if it could make the charges disappear. (Tr. 53). Special Agent Jacobs testified that Mr. Kellam further stated that he had a Dominican source in New York and a source in Atlanta. (Tr. 54).

On cross-examination, Special Agent Jacobs testified that the agents were aware that Mr. Coverdale was the driver of the vehicle, and that agents made eye contact with Mr. Coverdale during a stop on the New Jersey Turnpike, but did not have a conversation with him. (Tr. 71-73). Special Agent Jacobs testified that he did not note this contact in any of the reports that he prepared. (Tr. 74).

Special Agent Jacobs testified that it took New York DEA agents approximately one hour to locate the vehicle after it arrived in New York, and that he did not have any information as to whether Mr. Kellam was in the vehicle. (Tr. 75). Special Agent Jacobs also testified that the traffic stop was made because Mr. Coverdale had a suspended license, had exceeded the speed limit and had tinted windows that were in violation of Delaware law. (Tr. 80). Special Agent Jacobs testified that Mr. Coverdale was issued a speeding ticket, but did not receive a ticket for the tinted windows. (Tr. 80).

During cross-examination, Defense Counsel attempted to further question Special Agent Jacobs about the basis for the traffic stop. The Government stated that it was not relying on drug information as to the initial stop, and that the agents knew during the course of the day that Mr.

Coverdale and Mr. Kellam were on probation, that the vehicle had tinted windows, and that Mr. Coverdale had a suspended license. (Tr. 87-92).

### III. ARGUMENT

The Court should suppress the evidence recovered in this matter, including statements made during or after the arrest, because law enforcement officials improperly engineered the basis for the traffic stop that led to the discovery of drugs. Here, law enforcement officials knowingly and intentionally permitted a confidential informant to continuously commit various traffic violations, including driving with a suspended driver's license, so that they could stop and search the vehicle for drugs. This conduct clearly violates the Fourth Amendment's protections against unreasonable searches and seizures, and any evidence obtained as a result of this violation must be suppressed as "fruit of the poisonous tree." Wong-Sun v. United States, 371 U.S. 407, 484-485 (1963).

Temporary detention of individuals during an automobile stop by the police, "even if only for a brief period, constitutes a 'seizure' of 'persons'" within the meaning of Fourth Amendment. Whren v. United States, 517 U.S. 806, 809-10 (1996) ("An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."); see also United States v. Delfin-Colfina, 464 F.3d 392 (3d Cir. 2006) ) (stating that a traffic stop will be deemed a reasonable seizure if the police possessed, specific, articulable facts that the individual violated a traffic law at the time of the stop).

In Delfin-Colfina, the Third Circuit stated that although "reasonable suspicion is a generally undemanding standard . . . a reviewing court must consider whether the 'rational inferences from those facts reasonably warrant [the] intrusion.' Ultimately, our mandate is to weigh 'the totality of the circumstances-the whole picture." Id. at 397 (internal citations omitted). The court further

explained that a traffic stop will be deemed a reasonable "seizure when an objective review of the facts shows that an officer possessed specific, articulable facts than an individual was violating a traffic law at the time of the stop." Id. at 398.

Although the officers' subjective intent is generally not relevant to the court's determination, the Delfin-Colfina court explained:

> [A]n officer's Fourth Amendment burden of production is (1) to identify the ordinance or statute that he believed had been violated, and (2) provide specific articulable facts that would support an objective determination of whether any officer could have possessed reasonable suspicion of the alleged infraction. As long as both prongs are met, an officer's subjective understanding of the law at issue would not be relevant to the court's determination.

Id. at 399-400. Mr. Kellam submits that where, as here, a reasonable officer would have initiated the traffic stop earlier in the day, when he or she first observed any perceived traffic violations, the agents' subjective reasons for stopping the vehicle must be included in the Court's review of the totality of the circumstances leading to the traffic stop.

At the outset, the record clearly demonstrates that on the day of the traffic stop: (1) agents previously knew that Mr. Coverdale, the vehicle's driver, had a suspended driver's license; (2) agents previously knew that Mr. Coverdale and Mr. Kellam were on probation, as confirmed by morning surveillance and Mr. Coverdale's statement that Mr. Kellam had a scheduled probation visit at his home the next day; and (3) the vehicle, which had tinted windows, was previously known to agents, and observed during morning surveillance. Thus, the agents were aware, prior to the New York trip, of the traffic violations that they allegedly relied on to make the subsequent traffic stop.

As conceded by the Government, the officers had no reason to stop the vehicle beyond the alleged traffic violations. That being the case, a reasonable officer with an understanding of traffic laws would have conducted a traffic stop at the time that he or she observed the violations and not, hours later.

The agents here, however, allowed the vehicle to travel to New York because they believed, without current information from the confidential informant, that the vehicle was traveling to New York for a drug purchase.[4] And where, as here, the agents had no corroborating evidence of drug activity in New York, the traffic stop was merely a pretext for an investigatory stop and arrest that lacked reasonable suspicion or probable cause. See e.g., United States v. Coker, No. 05-4056, 2007 WL 931107 (3d Cir. Mar. 29, 2007) (stating that an investigatory stop requires that the police have reasonable suspicion based on articulable facts that a crime has been committed); Beck v. Ohio, 379 U.S. 89, 91 (1964) (stating that probable cause for arrest depends "upon, whether at the moment arrest was made . . . the facts and circumstances within [the officers'] knowledge and of which they

---

[4] Mr. Kellam notes that although the drug information is not the focal point of this suppression memorandum, it demonstrates that the officers' reason for stopping the vehicle was drug-related. Additionally, Mr. Kellam further notes that the discovery stated that the officers knew that the vehicle was traveling to New York based on the confidential informant's information, and that the vehicle, on the trip back into Delaware traveled at, or slightly above the speed limit and almost always used a turn signal. See Criminal Complaint and Affidavit (stating that the agents conducted the traffic stop and arrests because of the confidential informant's statements, the driving behavior and "brief stop in the Bronx[,] where [Mr. Kellam] previously purchased the cocaine.").

Special Agent Jacobs, however, testified that Mr. Coverdale told that the agents that the Atlanta trip was cancelled, and that he would be dropped off at his home. Special Agent Jacobs also testified that agents had no further contact with Mr. Coverdale until after the traffic stop, and that the vehicle sped on its way back to Delaware. To the extent that the Government relies solely on Agent Jacobs testimony to establish reasonable suspicion for the traffic stop, that testimony is inconsistent with the other evidence in this case.

11

had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.").

As previously argued, if the sole basis for the stop was the commission of traffic violations, the officers had several opportunities to stop the vehicle for traffic violations: (1) during morning surveillance, when officers observed the tinted windows, knew the occupants were on probation and had prior knowledge of Mr. Coverdale's suspended license; (2) when agents observed it speeding and rarely using turn signals on its way to New York; or (3) when it attempted to leave the state of Delaware on its way to New York.

Law enforcement officials clearly acted with the purpose of engaging Mr. Kellam in an alleged drug transaction. Authorizing or permitting a confidential informant to commit traffic and probation violations and then relying on these violations as the basis for a traffic stop is reprehensible and severely circumvents the Fourth Amendment's protections. This Court should not accept such Government-sanctioned traffic stops to search for evidence. Thus, any evidence obtained from this illegal seizure, including statements made during, or post-arrest, must be suppressed as fruit of poisonous tree. See Wong Sun v. United States, 371 U.S. 471 (1963).

## IV. CONCLUSION

For the foregoing reasons, the Court should exclude the Government's admission, at trial, of any and all physical evidence and statements that were obtained in violation of Mr. Kellam's Fourth and Fifth Amendment rights.

Respectfully submitted,

*Edson A. Bostic/TNH*
Edson A. Bostic, Esquire
Federal Public Defender

Tieffa N. Harper
Research & Writing Attorney

Attorneys for Steven Kellam

Federal Public Defender's Office
District of Delaware
704 King Street, Suite 110
Wilmington, Delaware 19801
(302) 573-6010
ecf_de@msn.com

Dated: August 21, 2007