IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA, :
:
      Plaintiff, :
:
  v. : Criminal Action No. 07-22-JJF
:
STEVEN KELLAM, :
:
      Defendant. :
:

---

Colm F. Connolly, Esquire, United States Attorney, and Ilana H. Eisenstein, Esquire, Assistant United States Attorney, of the OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware.

Attorneys for Plaintiff.

Edson A. Bostic, Esquire, Federal Public Defender, and Tieffa N. Harper, Esquire, Research & Writing Attorney, of the OFFICE OF THE FEDERAL PUBLIC DEFENDER, Wilmington, Delaware.

Attorneys for Defendant.

---

**MEMORANDUM OPINION**

February 26, 2008
Wilmington, Delaware

Farnan, District Judge.

Pending before the Court is an Amended Motion To Suppress Physical Evidence And Statements (D.I. 12) filed by Defendant, Steven Kellam. For the reasons discussed, Mr. Kellam's Motion will be denied.

I.  BACKGROUND

On February 15, 2007, Defendant, Steven Kellam, was indicted on one count of possession of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). On April 27, 2007, Mr. Kellam filed the instant Motion seeking to suppress evidence seized in connection with what he contends was an illegal pretext stop and search of a vehicle in which he was riding as a passenger on February 6, 2007. Mr. Kellam also moves to suppress statements he made subsequent to the allegedly illegal search. The Court conducted an evidentiary hearing on July 11, 2007. During the hearing, the parties agreed to limit the issues presented to the legality of the initial traffic stop which led to the search of the vehicle and the arrest of Mr. Kellam.

By his Motion, Mr. Kellam contends that law enforcement officials lacked reasonable suspicion to stop the vehicle in which Mr. Kellam was riding as a passenger. Specifically, Mr. Kellam contends that law enforcement officers "improperly engineered the basis for the traffic stop" by knowingly and

1

intentionally allowing the Government's confidential informant driving Mr. Kellam, to commit various traffic violations, including driving with a suspended license, so that the officers could eventually stop and search the vehicle. Mr. Kellam contends that a reasonable officer with an understanding of the traffic laws would have conducted the stop at the time the violations were known or observed and not several hours later. Thus, Mr. Kellam contends that the Court should consider the officers' actual or subjective reason for stopping the vehicle, which stop resulted in Mr. Kellam's arrest for an alleged drug offense.

## II.  FINDINGS OF FACT

Based on the evidence presented at the suppression hearing, the Court finds the following facts:

Led by Special Agent Thomas E. Jacobs, the Drug Enforcement Administration ("DEA") began a multi-agency investigation of Mr. Kellam which commenced in October of 2006. (Tr. 15.) The other agencies involved in the investigation included the Bureau of Alcohol, Tobacco and Firearms ("ATF") and the Dover, Delaware Police Department (collectively, "the Task Force"). (Id. at 16.) Although Agent Jacobs did not specifically testify as to what investigative activity occurred between October 2006 and February 2007, the Court finds, based on reasonable inference from the testimony of Agent Jacobs, that the investigation of Mr. Kellam

focused on alleged drug trafficking by him.

Agent Jacobs testified that on the morning of February 5, 2007, Task Force Officer Mark Gray received information from the Government's confidential informant (the "Informant") that the Informant and Mr. Kellam would be going to the State of Delaware Probation and Parole Office (the "Probation Office") in Dover, Delaware to meet with their respective probation officers. (Id.) The Informant further advised Officer Gray that after he and Mr. Kellam completed their probation interviews that they would be traveling to Atlanta, Georgia for a "drug-related trip." (Id.)

With this information, officers from the Task Force established surveillance of the Probation Office and observed the Informant and Mr. Kellam arrive at the Probation Office in a 2004 black Mitsubishi Galant. (Id. at 16-17.) At that time, the Informant was driving the vehicle, and Mr. Kellam was in the front passenger seat. (Id. at 17.) Once Mr. Kellam and the Informant entered the Probation Office, Task Force Officers met with the Informant in a side room. (Id. at 17.) The Informant informed the officers that upon leaving the Probation Office, he and Mr. Kellam were planning to switch cars. Specifically, they were going to pick up a Nissan Altima and drive the Altima to Atlanta. (Id.) The Informant was instructed by the officers to maintain contact with them to the best of his ability and to pull over in a predesignated location if he should observe a large

amount of cash in the vehicle.[1] (Id. at 17-18.)

The officers then observed Mr. Kellam and the Informant leave the Probation office at approximately 11 a.m. and drive south in the Mitsubishi. (Id. at 18, 19.) Several officers, including one group consisting of Special Agent Jeff Dunn and Intelligence Analyst Chris Callahan, Officers Mailey and Gray, Special Agents Scott Curley and Dave DiBetta from ATF, and Officer Ron Marzac, conducted surveillance of the vehicle after it departed Dover. (Id. at 20.) The Informant and Mr. Kellam were observed going to the residence of Lamont Johnson located in the Walkers Mill Trailer Park in Bridgeville, Delaware. (Id. at 21.) Officer Marzac knew Mr. Johnson's identity from a previous case. (Id. at 22.) Agent Jacobs also received information that Mr. Johnson was one of Mr. Kellam's "lieutenants" or "subdistributors" of cocaine. (Id.)

The Informant and Mr. Kellam stayed at Mr. Lamont's residence for a period of about thirty minutes. (Id.) During that time, the Informant drove the vehicle to a local store and met with Officer Gray and other officers. (Id.) The Informant explained to the officers that he and Mr. Kellam were supposed to

---

[1] The Court notes a possible discrepancy regarding this testimony. Agent Jacobs testified on cross-examination that when the Informant met with Task Force officers in the Probation Office that Mr. Kellam already had $9,000 on his person. (Tr. at 59.) As a result, Agent Jacobs testimony is unclear to the Court concerning the instructions to the Informant regarding the observation of significant amounts of money.

swap the Mitsubishi for the Altima at Johnson's residence, but Johnson's girlfriend had to use the car, so they would be unable to switch cars. (Id. at 23.) The officers again instructed the Informant to pull over into a local Hardee's restaurant if he observed a large amount of cash in the vehicle once they departed from Johnson's residence. (Id.) The Informant then returned to Johnson's residence. (Id.)

The team surveilling the Mitsubishi then observed the vehicle leaving Johnson's residence and going to the Georgetown Apartments where a third individual, later identified as Antoine Crawford, was picked up. (Id. at 24.) The vehicle then proceeded to the residence of LeToya Jackson, Mr. Kellam's girlfriend, located on Woodbranch Road in Georgetown, Delaware. (Id. at 24-25.) Officers observed Mr. Kellam exit the vehicle, enter the house for a few minutes and then exit with a package. (Id. at 25.) Mr. Kellam got back into the vehicle and all three men drove towards Sussex to the Mount Joy community, an area where Mr. Kellam has relatives and was known to frequent. The vehicle remained in this vicinity for only a few minutes. (Id.)

After leaving the Mount Joy area, the vehicle headed towards a store in Milton, Delaware, which is north of Georgetown and towards the Dover area. At that point, the Informant contacted the Task Force officers and told them that the trip to Atlanta was cancelled because Mr. Kellam's probation officer wanted to

5

meet with him the next day at a residence in Smyrna, where Mr. Kellam had told the probation officer he was living. The Informant explained that they could not return from Atlanta in time for this meeting, so the Atlanta trip was cancelled. The Informant also indicated that he was going to be dropped off at his residence. (Id. at 26-27.)

Despite the Informant's assertion that the Atlanta trip was cancelled, the Task Force officers maintained surveillance of the Mitsubishi by both land and air. (Id. at 27.) The vehicle was driven to the Dover Mall where a fourth individual, Terrence Johnson, was picked up. Task Force officers observed the vehicle traveling northbound on Route 1, across the Delaware Memorial Bridge into New Jersey. The vehicle then pulled off at a rest stop in New Jersey and continued northbound on the New Jersey Turnpike. The vehicle was then followed across the George Washington Bridge into New York City. (Id. at 27.) At that time, Task Force officers believed that the Informant was still driving the vehicle, and that Mr. Kellam was riding as a front seat passenger with the other two individuals in the back seat. (Id. at 28.)

During his testimony, Agent Jacobs was asked to explain, in his experience, the manner in which drug dealers prepare for buying drugs. Agent Jacobs explained that based upon his 17 years of experience, drug dealers who are going to make a long

trip for the purchase of drugs are not going to buy a small amount of drugs. He explained that typically, they either go around to collect money, if they need money to make the purchase, or they go around to collect orders to determine the quantity of drugs they need to purchase on the trip. Agent Jacobs explained that these stops are usually "short-lived in nature because they're coming by to either say, you know, I want 5 ounces or here's $5,000, and it takes a couple minutes to do that, and then they'll go around and do these little pick-ups." (Id. at 28-29.) Based on this experience and his observations of the activities of the Mitsubishi on February 5, 2007, Agent Jacobs concluded that if the occupants of the Mitsubishi were not going to Atlanta, then they were going to New York City, a main drug source for the Delaware area, to pick up a controlled substance. (Id. at 30.)

Several officers followed the vehicle to New York, including Agent Jacobs, Special Agent Dunn, Intelligence Analyst Callahan, and Task Force Officers Mailey, Tyndall and Marzac. (Id. at 30-31.) Air surveillance of the Mitsubishi continued during this time period and followed the vehicle as it was going into New York City. (Id. at 31.) However, the airplane was prohibited from entering New York air space, and the air surveillance was broken at that time. (Id.)

Task Force officers later learned that when the Mitsubishi had stopped on the New Jersey Turnpike around 6:00 p.m., the Informant had attempted to contact Task Force Officer Gray. However Officer Gray did not receive the call because he was at the Delaware River and Bay Police Building at that time coordinating their help in the investigation, and there was no phone reception. (Id.) As a result, Agent Jacobs testified that the officers' last contact with the Informant had been at the stop at the convenience store in Milton.[2] (Id. at 32.)

Once the Mitsubishi crossed into New York City, it was lost by the officers surveilling it. Agent Jacob testified that this was around 5:30 or 6:00 p.m.; however, his time estimation conflicts with his earlier testimony that the Informant tried to contact Officer Gray around 6:00 p.m. when the vehicle was on the New Jersey Turnpike. (Compare Tr. at 32 with Tr. at 31.)

Officers in New York had been contacted earlier in the day to assist in the surveillance of the vehicle, and those officers were ultimately able to locate the vehicle on Cabrini Boulevard

---

[2] Agent Jacobs testimony was also inconsistent on this point. During cross-examination, Agent Jacobs testified that during the stop on the New Jersey Turnpike, the Informant went into a convenience store and Agent Marzac was present in the store and made eye contact with the Informant, but no oral contact because other individuals were around him. Agent Jacobs said he was told that the Informant did not feel comfortable having a conversation with the agent in the store. (Tr. at 72-73.)

in Manhattan.[3]  (Id. at 32.)  However, the New York officers could only observe three individuals in the vehicle, and they were unaware as to the location of the fourth individual.  (Id. at 33.)  The vehicle left New York shortly after 9:00 p.m., and was followed by the New York officers as it drove back into New Jersey.[4]  (Id.)  Agent Jacobs believed there was only three subjects in the car when it left New York.  (Id.)

The vehicle then pulled into the first rest stop in New Jersey where the surveillance was taken over by Special Agent Dunn and Intelligence Analyst Callahan.  The vehicle left the rest stop and proceeded down the New Jersey Turnpike where it later exited the Turnpike.  When the vehicle exited the Turnpike, Special Agent Dunn was unable to pull behind the vehicle, and surveillance was lost.[5]  (Id.)

---

[3]   During cross-examination, Agent Jacobs testified that prior to the vehicle being observed on Cabrini Boulevard, he had received information that any drug dealing that Mr. Kellam would be involved in would be conducted in the Bronx, not Manhattan. (Tr. at 76.)  Agent Jacobs also testified on cross-examination that surveillance of the vehicle was picked up around 6:30 or 7:00 p.m. in New York; however, his previous testimony indicated that the Informant was on the New Jersey turnpike at about that time trying to contact Officer Gray.  (Compare Tr. at 76 with Tr. at 31.)

[4]   Agent Jacobs testified that the New York officers surveilled the car for about 2 to 2 and one-half hours in New York.  (Tr. at 76.)  On cross-examination, he said the vehicle left New York at 9 p.m or 9:30 p.m.  (Id. at 78.)

[5]   Agent Jacobs testified that surveillance was broken in the 9:30 to 10:00 p.m. time frame.  (Tr. at 79.)

Surveillance did not resume until nearly midnight, when the vehicle was located crossing back into Delaware from New Jersey over the Delaware Memorial Bridge. (Id. at 34.) Officer Gray had secured the assistance of the Delaware River and Bay Authority officers during his meeting with them at 6 p.m. that evening and constant contact had been maintained with the Delaware River and Bay Authority for nearly six hours. (Id. at 31, 38.) Delaware River and Bay Authority officers have the authority to conduct traffic stops and arrests for violations of probation. (Id. at 38.) Task Force officers briefed the Delaware River and Bay Authority officers on their investigation and the planned stop of the Mitsubishi. (Id.)

At the time of the stop, Agent Jacobs knew that the Informant did not have a valid driver's license and that there were several capiases for his arrest. (Id. at 34.) On the night of February 5th, while at the Delaware River and Bay Authority police station, Special Agent Curley checked the driving record of Mr. Kellam and also learned that he did not have a valid driver's license. (Id.) In addition, Agent Jacobs had previous knowledge that both Mr. Kellam and the Informant were on probation. (Id. at 36.) During the evening of February 5th, Special Agent Curley contacted the Delaware Probation Office and learned that Mr. Kellam and the Informant were on Level III probation, meaning that they were not allowed to leave the state

10

without permission or be out past 10:00 p.m. Special Agent Curley also confirmed with the Probation Office that neither the Informant nor Mr. Kellam had been given permission to leave the state or be out past midnight.[6]  (Id.)

Just before midnight, Delaware River and Bay Authority police initiated a stop of the vehicle. (Id. at 34, 37-38.) Three or four Delaware River and Bay police vehicles were involved in the stop of the Informant's vehicle. Federal agents from the ATF and DEA were behind the River and Bay police or off to the side. (Id.) None of the officers involved could tell who was driving the vehicle at the time it was stopped because the windows were tinted. (Id. at 35.) It was only after the driver exited the vehicle that officers were able to determine that the Informant had been driving. (Id. at 39.) The Informant was brought to the rear of one of the police vehicles and Agent Jacobs approached him and asked him if there were any narcotics in the car. (Id. at 40.) The Informant responded that drugs were in the car above the dome light. (Id.) Agent Jacobs also asked the Informant why he didn't try to contact officers about the New York trip, and the Informant responded that he tried to contact Officer Gray. Officer Gray confirmed that he had missed the Informant's call. (Id. at 41.)

---

[6]    Agent Jacobs testified that the vehicle was also observed speeding just before the stop; however, no ticket was ever issued for speeding. (Tr. 80.)

11

There were a total of four occupants in the vehicle, including the Informant. Each occupant was ordered out separately.[7] (Id. at 42.) According to Agent Jacobs, this procedure was allegedly followed due to Mr. Kellam's known history of being involved with cocaine and firearms,[8] and the officers' knowledge gained during the surveillance of the vehicle. Specifically, Agent Jacobs testified that he believed that a good size quantity of drugs would be purchased during the trip and that in his experience, drug dealers trafficking large amounts sometimes carried firearms to protect their cash on the way to the sale and their drugs on the way back from the sale. (Id. at 43.) However, Agent Jacobs also testified that officers could not see into the vehicle, and therefore, they did not know whether a weapon was in the car. (Id. at 44.)

The Informant was placed under arrest for violation of probation.[9] (Id. at 45.) He was also issued two tickets by the

---

[7] When the vehicle left New York City, Agent Jacobs testified that he believed there were only three individuals in the car.

[8] According to Agent Jacobs, the Delaware State Police had conducted a search of a residence where Mr. Kellam was staying and recovered two firearms. Agent Jacobs also had information that Mr. Kellam and others known to be involved with Mr. Kellam in the drug trade carried firearms on some of their trips. (Tr. 43.)

[9] Agent Jacobs acknowledged that he was not designated by the Informant's probation officer to make the arrest and that the arrest was to be made by the Delaware River and Bay Police. However, he also testified that Agent Curley spoke with Mr.

12

Delaware River and Bay Authority police, one for driving without a license and one for driving with a dark tinted windshield.[10] (Id. at 46, 80.)

The occupants of the vehicle were taken to the Delaware River and Bay Authority police station[11], and the car was driven to a garage there. (Id. at 49.) The New Castle County K-9 Unit, accompanied by New Castle County Police Officer Krajewski, conducted a canine search of the vehicle. The dog alerted on the vehicle, and Officer Krajewski informed Agent Jacobs that there was an alert on the area of the dome light. Agent Jacobs proceeded straight to the dome light area and pulled down the header material. (Id. at 49.) Agent Jacobs testified that he then observed a large cylindrical item wrapped in duct tape. (Id. at 50.) The item was sent for analysis, but Agent Jacobs believed it contained cocaine. (Id.)

---

Kellam's probation officer, Ralph Liberator, and Mr. Liberator asked that the police detain Mr. Kellam for violation of probation. When pressed as to whether Mr. Liberator instructed the Delaware River and Bay Police to stop the vehicle for the purpose of detaining Mr. Kellam and the Informant, Agent Jacobs testified that he did not know whether Mr. Liberator gave such instructions. (Tr. at 80-81.)

[10] The registration of the vehicle was also checked and it was confirmed that it was registered to LeToya Jackson, Mr. Kellam's girlfriend. (Tr. at 47.)

[11] In addition to the Informant and Mr. Kellam, the other occupants were identified as Antoine Crawford, who had been picked up in Georgetown, and Terrence Johnson, who had been picked up at the Dover Mall. (Tr. at 51.)

Agent Jacobs, along with Task Force Officers Tony James and Ron Marzac, met with Mr. Kellam in an interview room at the Delaware Bay and River police station. Agent Jacobs advised Mr. Kellam of his Miranda rights using a card he kept in his wallet. (Id. at 52.) Mr. Kellam indicated that he understood his rights and that he was willing to answer some questions. (Id. at 53.)

Mr. Kellam denied any knowledge of the drugs found in the vehicle. Mr. Kellam was asked why he went to New York and he stated that he had to pick up his watch and a fur coat that he had taken to New York to repair. Agent Jacobs asked him how much the coat cost and he responded that he bought it a few years ago and it cost approximately $200. Agent Jacobs also asked Mr. Kellam what kind of watch was repaired, and Mr. Kellam responded that it was a Jo-Jo. (Id.)

### III. CONCLUSIONS OF LAW

For purposes of this Motion, the Government contends that reasonable suspicion of traffic and probation violations justified a Terry stop of the Mitsubishi vehicle being driven by its Informant on February 5, 2007. (Tr. 90; D.I. 25 at 5.) However, the Government does not rely on any information concerning any drug offense as justification for the stop. (Tr. 90.) Instead, the Government proffers the following as justification for the stop: (1) the Government's Informant was violating his conditions of probation; (2) the Government's

Informant had outstanding arrest warrants; (3) the Government's Information was driving without a license, and (4) Mr. Kellam was violating the conditions of his probation. (D.I. 25 at 6-7.)

The Fourth Amendment to the United States Constitution protects "the right of the people to be secure against unreasonable searches and seizures. . . ." U.S. Const, amend IV. A defendant who files a motion to suppress ordinarily carries the burden of proof. Rakas v. Illinois, 439 U.S. 128, 130 n. 1 (1978). However, where a search is conducted without a warrant, as is the case here, the burden shifts to the Government to demonstrate by a preponderance of the evidence that the search was conducted pursuant to one of the exceptions to the warrant requirement. See United States v. Herrold, 962 F.2d 1131, 1137 (3d Cir. 1992). Evidence obtained pursuant to a warrantless search that does not meet an exception to the warrant requirement must be suppressed as "fruit of the poisonous tree." United States v. Brown, 448 F.3d 239, 244 (2006) (citing Wong Sun v. United States, 371 U.S. 471, 487-88 (1963)).

Police are vested with the constitutional authority to conduct a limited, warrantless, investigatory stop in a public place if an officer has a reasonable suspicion of criminal activity. Terry v. Ohio, 392 U.S. 1, 88 (1968). During a traffic stop, the temporary detention of individuals, including the passengers of the automobile, constitutes a "seizure" within

the meaning of the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809 (1996); United States v. Mosley, 454 F.3d 249 (3d Cir. 2006) ("[A] traffic stop is a seizure of everyone in the stopped vehicle.").

Reasonable suspicion requires that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). While Fourth Amendment jurisprudence demands particularized suspicion, courts also recognize that officers must be allowed "to draw on their experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." United States v. Arvizu, 534 U.S. 266, 273 (2002). Reasonable suspicion is to be viewed from the vantage point of a "reasonable, trained officer standing in [the detaining officer's] shoes." Johnson v. Campbell, 332 F.3d 199, 206 (3d Cir. 2003). Whether the police have reasonable suspicion is determined from the totality of the circumstances. Cortez, 449 U.S. at 417. In evaluating whether a particular search was reasonable, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Terry, 392 U.S. 21-22.

16

The subjective intentions of law enforcement officers play no role in the analysis of whether reasonable suspicion or probable cause justifies a stop or arrest. Whren, 517 U.S. at 808-809; United States v. Delfin-Colina, 464 F.3d 392, 398 (3d Cir. 2006) (collecting cases). While the Supreme Court has been unwilling to examine the actual motivations of individual officers in the context of Fourth Amendment stops and searches, Whren, 517 U.S. at 817, the Court does not believe that the holding in Whren was meant to provide limitless authorization for bad faith stops and searches. Indeed, "there must be a point where the combination of pretext and continuing bad faith cannot be tolerated if the Fourth Amendment protections are to have any meaning whatsoever." United States v. Castro, 166 F.3d 728 (5th Cir. 1999) (Politz, J., dissenting).

In this case, the Task Force officers were working with the Government's Informant throughout the course of the day in question. These officers knew that their Informant did not possess a valid driver's license, was driving in a vehicle with tinted windows, and that their Informant, along with Mr. Kellam, was a probationer subject to certain rules and restrictions. These officers placed their Informant with Mr. Kellam and actively counseled their Informant's conduct with Mr. Kellam.

The Government contends that it is not relying on any drug information to support the stop of the vehicle. The Government's

17

justification for the stop arises from information known to the Task Force officers from the commencement of the surveillance operation at the State Probation Office in Dover. In the Court's opinion, the vehicle being driven by the Government's Informant was stopped because the Task Force officers believed Mr. Kellam had engaged in some activity related to drug trafficking during the trip to New York. The Court is convinced that the violations asserted as grounds for the stop of the vehicle existed, but the vehicle was stopped so as to permit the officers to search the vehicle for evidence of drug trafficking offenses Mr. Kellam was suspected of committing.

Because the existing case law does not allow the Court to consider subjective or pretextual reasons for a Terry stop, Mr. Kellam's Motion must be denied.

## IV. CONCLUSION

For the reasons discussed, the Court will deny Mr. Kellam's Amended Motion To Suppress Physical Evidence And Statements.

An appropriate Order will be entered.